IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

P.M., by and through his          )     CIVIL 15-00437 LEK-RLP
Father, ALEX CLARFELD,            )
                                  )
          Plaintiffs,             )
                                  )
     vs.                          )
                                  )
DEPARTMENT OF EDUCATION,          )
STATE OF HAWAII, and              )
KATHRYN MATAYOSHI,                )
superintendent of the Hawaii      )
Public Schools,                   )
                                  )
          Defendants.             )
_____   )


**ORDER AFFIRMING THE HEARINGS
OFFICER'S SEPTEMBER 22, 2015 DECISION**

On October 20, 2015, Plaintiffs P.M. ("Student"), by

and through his Father, Alex Clarfeld ("Father," collectively

"Plaintiffs") filed an appeal of the Administrative Hearings

Officer's ("Hearings Officer") September 22, 2015 Findings of

Fact, Conclusions of Law and Decision ("Decision").[1] [Complaint,

filed 10/20/15 (dkt. no. 1).]  Plaintiffs filed their opening

brief on June 13, 2016.  [Dkt. no. 23.]  Defendant the Department

of Education, State of Hawai`i ("Defendant" or "the DOE") filed

its answering brief on July 11, 2016, and Plaintiffs filed their

reply brief on July 25, 2016.  [Dkt. no. 25.]  The Court heard

oral argument in this matter on August 22, 2016.  At the request

_____

[1] The Decision is part of the Administrative Record on
Appeal ("ROA"), at 290-330.

of the Court, the DOE filed a supplemental brief on August 26, 2016, and Plaintiffs filed a supplemental brief on September 6, 2016. [Dkt. nos. 29, 30.] After careful consideration of the briefs, the arguments of counsel, and the relevant legal authority, the Decision is HEREBY AFFIRMED.

## BACKGROUND

At the time of the Decision, Student was nine years old and had been diagnosed with Autism Spectrum Disorder. Student's Home School is Wailuku Elementary School ("Home School"). [Decision at 2-3.] On February 23, 2015, Plaintiffs filed an Amended Complaint in the administrative proceeding before the Hearings Officer. [ROA, Exh. 1.] In the Amended Complaint, Plaintiffs allege the following:

> 5. Respondent failed to notify Father and secure Father's presence for the [individualized education program ("IEP")] developed on March 18, 2014, and March 20, 2014 . . . . The IEP was developed with a DOE-appointed surrogate parent, who was appointed while Student was in temporary foster custody from March 12, 2014, until March 21, 2014, only a 9-day period. While the surrogate parent may have replaced Father for the purpose of making educational decisions for Student during the surrogate's appointment, Father never lost his parental rights and was known and available to the DOE. Respondent deliberately excluded Father from the process of developing Student's March 2014 IEP. Respondent also failed to notify Student's court-appointed guardian ad litem of the March 2014 IEP and failed to secure her presence. Given the facts in this case, the DOE's failure to notify and include Father and the court-appointed guardian ad litem in the development of the IEP was a denial of [free appropriate public education ("FAPE")].

2

6.  Respondent materially failed to safely implement the February 7, 2014 IEP and the March 2014 IEP, resulting in multiple injuries to Student and subjecting Student to inappropriate conduct by DOE staff.

7.  Respondent's offer of speech-language therapy in the February 7, 2014, and March 2014 IEP is not sufficient to meet Student's needs and the DOE failed to materially implement both IEPs relating to speech-language therapy.  Student is autistic and non-verbal.  Student needs speech-language therapy of at least four days per week on a consistent basis in order to make sufficient progress to allow Student to receive educational benefit.

8.  On January 20, 2015, the DOE held an IEP meeting without Father present.  Father made a written request to hold the IEP meeting February 24, 2015, so that he could have an expert in autism also attend the IEP meeting.  The DOE refused Father's request stating the request was inappropriate since it "exceeds the annual due date for [Student's] IEP".  The only team members who participated in the January 20, 2015, IEP were the principal, general education teacher, and special education teacher.  The DOE denied Father the opportunity to participate in the IEP process, which was a violation of FAPE.

(Some alterations in Amended Complaint.)  On April 8, 2015, the

DOE filed a Motion for Partial Summary Judgment seeking the

dismissal of the claims in paragraphs six and seven of the

Amended Complaint.  [ROA, Exh. 6.]  Plaintiffs did not object to

the motion.  [Id., Exh. 7 (Statement of No Opposition to

Respondent's Motion for Partial Summary Judgment).]

The Hearings Officer convened a hearing on May 20, 2015

in Wailuku, Maui.  [ROA, Exh. 2 (Notice of Hearing and Pre-

Hearing Conference).]  In the Decision, the Hearings Officer

stated:

> [Plaintiffs] allege procedural and substantive
> violations of the [IDEA].  Specifically,
> Petitioners allege that the DOE denied Student a
> free appropriate public education ("FAPE").
> [Plaintiffs] raise the following issues:
>
>> A.   [The DOE] failed to notify Father and
>>      secure Father's presence for the
>>      Individualized Education Program ("IEP")
>>      developed on March 18, 2014 and on March
>>      20, 2014 . . . ; and
>>
>> B.   On January 20, 2015, the DOE held an IEP
>>      meeting without Father present.

[Decision at 2.]

### A.   <u>Participation in the 3/20/14 IEP</u>

The Hearings Officer found that, during the 2013–2014
school year, the Home School noticed "scratches, skin bleeding,
and head injuries" on Student.  [<u>Id.</u> at 3 (citing ROA, Hrg.
Trans. at 20).]  The Home School reported the injuries to Child
Protective Services ("CPS").  [<u>Id.</u> (citing ROA, Hrg. Trans.
at 21, 74).]  As a result, CPS removed Student from Father's care
from March 12, 2014 to March 21, 2014, during which time Student
was placed in temporary foster custody.  [<u>Id.</u> (citing ROA,
Pltf.'s Exh. 9 at 127; <u>id.</u>, Hrg. Trans. at 21).]   While in
temporary foster custody, Student was technically a "ward of the
State."  [<u>Id.</u> (citing ROA, Def.'s Exh. 10 at 355; <u>id.</u>, Hrg.
Trans. at 24).]  The Home School therefore requested a surrogate
parent for Student, and one was affirmed on March 14, 2014.
[<u>Id.</u>]  Father met the surrogate parent at a meeting at the Home

School on March 14, 2014 ("3/14/14 Meeting").  While not an
official IEP meeting, the attendees at the 3/14/14 Meeting,
including Home School employees, the surrogate parent, and
Father, "discussed providing Student with a damp towel,"
additional special education minutes, and parent education.  [Id.
at 3 (citing ROA, Def.'s Exh. 33 at 1150; id., Hrg. Trans. at 38-
40, 231-32).]

     Also on March 14, 2014, the Home School sent "an IEP
Conference Announcement to the surrogate parent," notifying the
surrogate parent of an IEP meeting on March 18, 2014.[2]  [Id. at 4
(citing Pltf.'s Exh. 8 at 124).]  The Hearings Officer found
that, on March 18, 2014, the surrogate parent instead "spoke to
staff at the Home School about amending the IEP without a
meeting."  [Id. at 21.]  To that end, on March 20, 2014, the
existing IEP was amended ("3/20/14 IEP") "to reflect the changes
discussed in the [3/14/14] Meeting."  [Id. at 4 (footnote
omitted) (citing ROA, Hrg. Trans at 281).]

     Insofar as Father argued that the surrogate parent did
not have the right to agree to the 3/20/14 IEP and waive the
meeting requirement, the Hearings Officer concluded that,

---

     [2] In the Decision, the Hearings Officer states that the
letter was sent in, and the IEP meeting was scheduled for, 2015,
but the document cited shows that this is a mistake – both
occurred in 2014.  See ROA, Pltf.'s Exh. 8 at 124 (Conference
Announcement to review Student's IEP, scheduled for March 18,
2014 at 2:00 p.m.).

pursuant to 20 U.S.C. § 1401(23), 34 C.F.R. § 300.30, Haw. Admin.
Reg. § 8-60-2, and Haw. Admin. Reg. § 8-60-73, "Father did not
have the legal authority to make Student's education decisions,
because Student had become [a] ward of the State."[3]   [Id. at 22-
23.]

   B.   **Participation in the 1/20/15 IEP**

        Father also alleges that he was denied parental
participation at the January 20, 2015 IEP meeting ("1/20/15
Meeting"), and therefore Student was denied a FAPE.   Father
removed Student from his Home School in April 2014, and he began
attending a private school on April 28, 2014.   [Decision at 5
(citing ROA, Pltf.'s Exh. 1 at 38; id., Hrg. Trans. at 25).]
Father agreed to attend an IEP meeting on June 17, 2014.   [Id.
(citing Pltf.'s Exh. 8 at 125).]   The June meeting was later
postponed at Father's request, and the Home School Principal
("Principal") and Father agreed to hold an IEP meeting on
August 21, 2014.   [Id. (citing ROA, Def.'s Exh. 21 at 463, 469;
id., Def.'s Exh. 22 at 614).]   The IEP team met on August 21,
2014 ("8/21/14 Meeting"), but was unable to complete the IEP
process.   [Id. (citing Hrg. Trans. at 244).]   In September 2014,
Father wrote to Principal and asked that the IEP meeting be

_____

   [3] At the May 2015 Hearing, Plaintiffs also argued that
Student's Guardian Ad Litem ("GAL") should have been included in
the 3/20/14 IEP, but the Hearings Officer disagreed.   [Decision
at 23-24.]   Plaintiffs did not appeal this issue.

postponed until the Clinical Director of the Center for Autism Related Disorders ("CARD") could attend the meeting.  [Id. (citing ROA, Def.'s Exh. 21 at 487).]  Father expressed a desire to have the CARD Clinical Director appear in person because, at least in part, "his heavy Russian Accent . . . could make it especially difficult for someone who is appearing by telephone or video conferencing to understand him."  [Id. (citing Pltf.'s Exh. 1 at 6; id., Hrg. Trans. at 34).]

Later that month, Principal requested possible meeting dates from Father, and Father responded by telling Principal that the CARD Clinical Director would be available in November 2014. [Id. at 5-6 (citing ROA, Def.'s Exh. 21 at 489, 491).]  On September 29, 2014, Principal wrote to Father with three dates ("9/29/14 Letter"), and Principal asked Father to pick two for a two-day IEP meeting.  [Id. at 6 (citing ROA, Def's Exh. 21 at 493).]  On October 23, 2014, Principal wrote Father another letter asking him to respond to the 9/29/14 Letter.  [Id.]  On November 24, 2014, after Father failed to respond to Principal's previous two letters, Principal wrote Father again and offered dates for an IEP meeting in December.  [Id. (citing ROA, Def.'s Exh. 21 at 499).]  Principal informed Father that, because Student was scheduled to return to the Home School in January 2015, it was important that they finish the IEP started at the 8/21/14 Meeting.  [Id.]  On December 1, 2014, Father contacted

the Home School and asked for an IEP meeting on December 16, 2014. [Id. (citing ROA, Hrg. Trans. at 57).] Father sent a letter to the Home School on December 15, 2014, in which he requested that Principal cancel the December IEP meeting. [Id. at 9 (citing ROA, Pltf.'s Exh. 1 at 2-3; id., Hrg. Trans. at 29).] Further, Father suggested that the Home School wait until he contacted them with firm dates on which the CARD Clinical Director could attend an IEP meeting. On December 16, 2014, the Home School held a "preparation meeting" without Father, where "[t]hey discussed their observations, a draft IEP and the possibility of a transition plan," but where "[n]o definitive IEP decisions were made." [Id. (citing ROA, Hrg. Trans. at 321-23).]

On December 17, 2014, Principal sent Father a letter informing him that, pursuant to the IDEA, the school needed to update Student's IEP by January 21, 2015. [Id. at 9 (citing ROA, Def.'s Exh. 21 at 514).] Principal proposed an IEP meeting for January 12, 14, or 16, 2015, and requested a response by December 31, 2014. [Id. at 9-10 (citing ROA, Def.'s Exh. 21 at 514).] Instead, Father responded on January 2, 2015, stating that he could not attend a meeting on January 12, 2015, because he was not involved in the scheduling process, and that he would like to hold the IEP meeting in February 2015 so that the CARD Clinical Director could attend in person. [Id. at 10 (citing ROA, Pltf.'s Exh. 1 at 4-5).] On January 7, 2015, Father sent another letter

8

requesting an IEP meeting on February 24, 2015 at 9:30 a.m.  [Id.
(citing ROA, Pltf.'s Exh. 1 at 6-7).]  That same day, the Home
School sent Father a letter ("1/7/15 Letter") stating that:  an
IEP needed to be completed before January 21, 2015; they wanted
to hold an IEP meeting on January 14 or 16, 2014; "the CARD
Clinical Director could participate via telephone or Skype"; and
Father could use a Russian interpreter at the IEP meeting.[4]  [Id.
(citing ROA, Pltf.'s Exh. 1 at 8).]

        Plaintiffs went on vacation off-island from January 9,
2015 to February 15, 2015.  [Id. (citing ROA, Pltf.'s Exh. 3 at
46; id., Hrg. Trans. at 182).]  On January 12, 2015, Principal
sent Father a letter ("1/12/15 Letter") stating that, if Father
did not respond, the IEP meeting would be held on January 16,
2016.  [Id. at 11 (citing ROA, Def.'s Exh. 21 at 532).]  The
1/12/15 Letter "reiterated that the CARD Clinical Director could
participate by Skype or telephone."  [Id.]  Principal wrote
Father a similar letter on January 14, 2016 ("1/14/15 Letter").
[Id. (citing ROA, Def.'s Exh. 21 at 537; id., Hrg. Trans. at
252).]  In the 1/14/16 Letter, Principal stated that "[i]f Father
and the CARD Clinical Director could not participate, the IEP
team could hold a meeting without them and use the new IEP on an

---

[4] Father testified that the CARD Clinical Director could not
appear at the IEP meeting via telephone Skype because she had
documents that she needed to use at the meeting.  [Id. at 10
(citing ROA, Hrg. Trans. at 34).]

interim basis until there was a meeting on February 24, 2015 with Father and the CARD Clinical Director." [Id.]  Father did not respond to the 1/7/15 Letter, the 1/12/15 Letter, or the 1/14/15 Letter.  The 1/20/15 Meeting followed, where the Home School updated the existing IEP ("1/20/15 IEP").  [Id. (citing ROA, Pltf.'s Exh. 1 at 15-35).]

On January 29, 2015, Principal sent Father a letter with a copy of the 1/20/15 IEP.  [Id. at 12 (citing ROA, Def.'s Exh. 21 at 542).]  The Home School intended for the 1/20/15 IEP to serve only as an interim IEP until the February 24, 2015 meeting with Father and the CARD Clinical Director.  [Id. (citing ROA, Hrg. Trans. at 259-60).]  On February 24, 2015, the Home School held another IEP meeting ("2/24/15 Meeting") and updated the 1/20/15 IEP ("2/24/15 IEP"), this time with, inter alia, Father and the CARD Clinical Director present.  [Id. at 13 (citing ROA, Pltf.'s Exh. 6 at 98).]  Because Student did not return to the Home School, no follow-up meeting ever took place. [Id. at 14 (citing ROA, Hrg. Trans. at 383).]

The Hearings Officer concluded that, pursuant to 34 C.F.R. § 300.345(d)(1)-(3),[5] an IEP meeting may go forward

---

[5] While the Hearings Officer cites 34 C.F.R. § 300.345(d)(1)-(3), new regulations went into effect in 2006 to implement changes to the IDEA made pursuant to the Individuals with Disabilities Education Improvement Act of 2004, Pub. L. 108-446, 118 Stat. 2647.  See Assistance to States for the Education of Children With Disabilities and Preschool Grants for Children
(continued...)

without a parent in attendance if there was an effort to include the parent and there is documented evidence of that effort. [Id. at 25.]  Further, the Hearings Officer found that "[t]he Home School had attempted to convene the IEP meeting several times, and Father continued to postpone or cancel the meeting." [Id. at 27.]  Specifically, the Hearings Officer stated:

> Father's non-responsiveness and delays were
> clearly calculated to delay the IEP.  This is
> buttressed by the fact that he did not tell the
> Home School that he would be off-island for most
> of January and February 2015.  Respondents offered
> IEP meetings in June, August, September, five in
> November, December 2014, and four in January 2015.
> To suggest that the DOE did not provide Father
> with an ample opportunity to participate flies in
> the face of the established testimony and facts.

[Id. at 29-30.]  Further, on more than one occasion, Father argued that rescheduling the meeting was required so that the CARD Clinical Director could attend, but "[t]he IEP team repeatedly made offers to have the CARD Clinical Director to [sic] participate via Skype or telephone conference," which was refused because the director allegedly had documents to present to the IEP team.  [Id. at 31.]  The Hearings Officer noted, however, that, "[t]here was no evidence presented that any 'documents' were presented by the Clinical Director at the IEP

---

[5](...continued)
with Disabilities, 71 Fed. Reg. 46540-01 (Aug. 14, 2006) (to be
codified at 34 C.F.R. pts. 300 and 301).  No substantive changes
were made to the requirements for parental participation, which
are now codified at 34 C.F.R. § 300.322(d)(1)-(3).

meeting." [Id.] Finally, the Hearings Officer found that, while Father stated that "his heavy Russian accent" was one of the reasons he did not want the CARD Clinical Director to appear by phone, "[a]ccommodations had been offered to Father, but he chose to refuse them." [Id. at 32.]

The Hearings Officer concluded that:

[T]he IEP team properly conducted the IEP meeting without Father pursuant to the requirements in 34 C.F.R. 300.345(d)(1)-(3). The Home School was unable to secure Father's presence, despite multiple attempts. The DOE recorded its attempts to arrange a mutually agreed on time and place, through telephone calls, emails, messages, and letters, and also recorded [Plaintiffs'] lack of responses and cooperation.

[Id. at 38.]

## STANDARD

This Court has also examined what constitutes a FAPE, and what is required in reviewing an administrative decision under the IDEA:

The IDEA defines FAPE as:

special education and related services that –

(A) have been provided at public expense, under public supervision and direction, and without charge;

(B) meet the standards of the State educational agency;

(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and

(D) are provided in conformity with the

individualized education program
required under section 1414(d) of this title.

[20 U.S.C.] § 1401(9).  To provide FAPE in compliance with the IDEA, a state educational agency receiving federal funds must evaluate a student, determine whether that student is eligible for special education, and formulate and implement an IEP.  See generally 20 U.S.C. § 1414.

The standard for district court review of an administrative decision under the IDEA is set forth in 20 U.S.C. § 1415(i)(2)(c), which provides:

In any action brought under this paragraph, the court –

(i) shall receive the records of the administrative proceedings;

(ii) shall hear additional evidence at the request of a party; and

(iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

This standard requires that "due weight" be given to the administrative proceedings.  L.M. v. Capistrano Unified Sch. Dist., 556 F.3d 900, 908 (9th Cir. 2009) (some citations omitted) (quoting Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982)).[6]  The amount of deference accorded is subject to the court's discretion.  J.W. [ex rel. J.E.W. v. Fresno Unified Sch. Dist.], 626 F.3d [431,] 438 [(9th Cir. 2010)] (citation omitted).  In reaching that determination, the court should consider the thoroughness of the hearings officer's findings, increasing the degree of deference where said

---

⁶ Rowley was superseded by statute on other grounds, as recognized in N.B. v. Hellgate Elementary School District, 541 F.3d 1202, 1213 n.3 (9th Cir. 2008).

findings are "thorough and careful." L.M., 556
F.3d at 908 (quoting Capistrano Unified Sch. Dist.
v. Wartenberg ex rel. Wartenberg, 59 F.3d 884, 892
(9th Cir. 1995)).  "Substantial weight" should be
given to the hearings officer's decision when it
"evinces his careful, impartial consideration of
all the evidence and demonstrates his sensitivity
to the complexity of the issues presented." Cnty.
of San Diego v. Cal. Special Educ. Hearing Office,
93 F.3d 1458, 1466-67 (9th Cir. 1996) (citation
and quotation marks omitted)).  Such deference is
appropriate because, "if the district court tried
the case anew, the work of the hearings officer
would not receive 'due weight,' and would be
largely wasted." Wartenberg, 59 F.3d at 891.

    "Harmless procedural errors do not constitute
a denial of FAPE.  However, procedural
inadequacies that result in the loss of
educational opportunity . . . clearly result in
denial of FAPE." Doug C. v. Haw. Dep't of Educ.,
720 F.3d 1038, 1043 (9th Cir. 2013) (citations and
internal quotation marks omitted).

    The burden of proof in IDEA appeal
proceedings is on the party challenging the
administrative ruling.  Hood v. Encinitas Union
Sch. Dist., 486 F.3d 1099, 1103 (9th Cir. 2007)
(citations omitted).  The challenging party must
show, by a preponderance of the evidence, that the
hearing decision should be reversed.  J.W., 626
F.3d at 438 (citation omitted).

N.B. v. Hawai`i, Civil No. 13-00439 LEK-BMK, 2014 WL 3663452, at

*2-3 (D. Hawai`i July 21, 2014) (some alterations in N.B.).[7]

---

[7] The Ninth Circuit has noted:

    Hawaii has fully implemented the purposes,
    guarantees, and protections of the IDEA into its
    own regulatory structure.  See Haw. Code R. §§ 8-
    60-1 to 8-60-84; see also § 8-60-1(b) ("This
    chapter shall be construed as supplemental to, and
    in the context of, the Individuals with
    Disabilities Education Act . . . and other federal
                                    (continued...)

## DISCUSSION

The Decision is thorough, careful, and well-reasoned. The findings are supported by appropriate evidence, and the conclusions demonstrate consideration of all of the evidence and the Hearings Officer's sensitivity to the complexity of the issues presented.  Accordingly, the Court gives "substantial weight" to the Hearings Officer's Decision.  See Cty. of San Diego, 93 F.3d at 1466-67.

Plaintiffs challenge the 3/20/14 IEP and the 1/20/15 IEP based on their belief that Father was denied parental participation at both IEP meetings.  [Opening Br. at 1.]  The Ninth Circuit has held:

> Parental participation in the IEP and educational placement process is critical to the organization of the IDEA.  See 20 U.S.C. § 1414(d)(1)(B)(i) (requiring the inclusion of parents on the IEP team); 34 C.F.R. § 300.321(a)(1) (same); 20 U.S.C. § 1415(b)(1) (requiring opportunities for parents "to participate in meetings with respect to

_____

[7](...continued)
> laws and regulations relating to the provision of a free appropriate public education to a student with a disability.").  Hawaii's regulations mirror the language in the IDEA regarding the IDEA's purposes, the guarantee of a FAPE, and the requirement of parent participation.  Compare Haw. Code. R. § 8-60-1 (purposes), with 34 C.F.R. § 300.1 (same); Haw. Code R. § 8-60-3 (guarantee of FAPE), with 34 C.F.R. § 300.101 (same); Haw. Code R. § 8-60-46 (parent participation), with 34 C.F.R. § 300.322 (same).

Doug C., 720 F.3d at 1043 n.4 (alterations in Doug C.).

identification, evaluation, and educational placement of the child").  Indeed, the Supreme Court has stressed that the IDEA's structure relies upon parental participation to ensure the substantive success of the IDEA in providing quality education to disabled students:

> [W]e think that the importance Congress attached to these procedural safeguards cannot be gainsaid.  It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process as it did upon the measurement of the resulting IEP against a substantive standard.  We think that the congressional emphasis upon full participation of concerned parties throughout the development of the IEP . . . demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.

Rowley, 458 U.S. at 205-06, 102 S. Ct. 3034 (citation omitted); see also Schaffer v. Weast, 546 U.S. 49, 53, 126 S. Ct. 528, 163 L. Ed. 2d 387 (2005) ("The core of the [IDEA] . . . is the cooperative process that it establishes between parents and schools. . . .  The central vehicle for this collaboration is the IEP process."); Honig v. Doe, 484 U.S. 305, 311, 108 S. Ct. 592, 98 L. Ed. 2d 686 (1988) ("Congress repeatedly emphasized throughout the [IDEA] the importance and **indeed the necessity of parental participation** in both the development of the IEP and any subsequent assessments of its effectiveness.") (emphasis added).[8]

Echoing the Supreme Court, we have held that parental participation safeguards are "[a]mong the

---

[8] Honig was superseded by statute on other grounds, as recognized in Joshua A. v. Rocklin Unified School District, 559 F.3d 1036, 1039 n.1 (9th Cir. 2009).

most important procedural safeguards" in the IDEA and that "[p]rocedural violations that interfere with parental participation in the IEP formulation process undermine the very essence of the IDEA." Amanda J. [v. Clark Cty. Sch. Dist.], 267 F.3d [877,] 882, 892 [(9th Cir. 2001)].  We have explained that parental participation is key to the operation of the IDEA for two reasons: "Parents not only represent the best interests of their child in the IEP development process, they also provide information about the child critical to developing a comprehensive IEP and which only they are in a position to know."  Id. at 882.

In accordance with the foregoing, the regulatory framework of the IDEA places an affirmative duty on agencies to include parents in the IEP process.  The public agency "responsible for providing education to children with disabilities," 34 C.F.R. § 300.33, is required to "take steps to ensure that one or both of the parents of a child with a disability are present at each IEP meeting or are afforded an opportunity to participate" including providing ample notice and "scheduling the meeting at a mutually agreed on time and place." 34 C.F.R. § 300.322(a).  Moreover, if a parent cannot attend, the agency must offer other methods of participation such as video or teleconferencing.  34 C.F.R. §§ 300.322(c), 300.328.  Most importantly, a meeting may **only** be conducted with a parent if "the public agency is **unable** to convince the parents that they should attend." § 300.322(d) (emphasis added).  And in that circumstance, the agency must keep a detailed record of its attempts to include the parent.  Id.  In Shapiro [v. Paradise Valley Unified Sch. Dist.], we clarified the limited circumstances under which a public agency can hold an IEP meeting without parental participation.  317 F.3d [1072,] 1078 [(9th Cir. 2003)].[9]  We held that parental "involvement in the 'creation process' requires the [agency] to

---

[9] Shapiro was superseded by statute on other grounds by 20 U.S.C. § 1414(d)(1)(B), as recognized in D.B. v. Santa Monica-Malibu Unified School District, 606 Fed. App'x 359 (9th Cir. 2015).

> include the [parents in an IEP meeting] unless
> they **affirmatively refused to attend**." Id.
> (emphasis added).

Doug C., 720 F.3d at 1043-44 (some alterations in Doug C.).

## I.    Parental Participation in the Development of the 3/20/14 IEP

Plaintiffs argue that "[b]ecause parental participation safeguards are among the most important procedural safeguards of the IDEA, schools should be required to include parents in every step of the process, to the extent possible, unless the parents are not available or refuse to participate." [Opening Br. at 20.]  It is undisputed that Student was removed from Father's care from March 12, 2014 to March 21, 2014.  According to Plaintiffs, Father should still have been involved in the development of the 3/20/14 IEP because "the parent should still be a participant in his or her child's educational decisions, even when the child is a ward of the State." [Id.]  Plaintiffs position is not supported by existing law.

"In enacting the [IDEA], Congress set forth a complex framework specifically designed to guide the relationship between federally funded public schools and their disabled students." Dallas v. Roosevelt Union Free Sch. Dist., 644 F. Supp. 2d 287, 292 (E.D.N.Y. 2009).  Further, "[t]he IDEA requires as part of a 'free appropriate public education,' that every public school that receives federal funds develop personalized education curricula for each student with a disability." Id.  The IDEA

18

defines "parent" as:

> (A) a natural, adoptive, or foster parent of a child (unless a foster parent is prohibited by State law from serving as a parent);
>
> (B) a guardian (but not the State if the child is a ward of the State);
>
> (C) an individual acting in the place of a natural or adoptive parent (including a grandparent, stepparent, or other relative) with whom the child lives, or an individual who is legally responsible for the child's welfare; or
>
> (D) except as used in sections 1415(b)(2) and 1439(a)(5) of this title,[10] an individual assigned under either of those sections to be a surrogate parent.

20 U.S.C. § 1401(23).  20 U.S.C. § 1415(b) explains when and how

a surrogate parent may be appointed:

> (2)(A) Procedures to protect the rights of the child whenever the parents of the child are not known, the agency cannot, after reasonable efforts, locate the parent, or the child is a ward of the State, including the assignment of an individual to act as a surrogate for the parents, which surrogate shall not be an employee of the State educational agency, the local educational agency, or any other agency that is involved in the education or care of the child.  In the case of –
>
> > (i) a child who is a ward of the State, such surrogate may alternatively be appointed by the judge overseeing the child's care provided that the surrogate meets the requirements of this paragraph; and
> >
> > (ii) an unaccompanied homeless youth as defined in section 11434a(6) of Title 42, the

---

[10] 20 U.S.C. § 1439(a)(5) concerns safeguards for protecting an infant or toddler, and is not relevant to the instant matter.

local educational agency shall appoint a
surrogate in accordance with this paragraph.

(B) The State shall make reasonable efforts to
ensure the assignment of a surrogate not more than
30 days after there is a determination by the
agency that the child needs a surrogate.

The IDEA defines "ward of the State" as "a child who, as

determined by the State where the child resides, is a foster

child, is a ward of the State, or is in the custody of a public

child welfare agency."  20 U.S.C. § 1401(36).

Similarly, 34 C.F.R. § 300 sets out regulations that

govern the IDEA "[t]o ensure that all children with disabilities

have available to them a free appropriate public education that

emphasizes special education and related services designed to

meet their unique needs and prepare them for further education,

employment, and independent living[.]"  34 C.F.R. § 300.1(a).  34

C.F.R. § 300.30 states:

(a) Parent means –

(1) A biological or adoptive parent of a
child;

(2) A foster parent, unless State law,
regulations, or contractual obligations with
a State or local entity prohibit a foster
parent from acting as a parent;

(3) A guardian generally authorized to act as
the child's parent, or authorized to make
educational decisions for the child (but not
the State if the child is a ward of the
State);

(4) An individual acting in the place of a
biological or adoptive parent (including a

20

> grandparent, stepparent, or other relative) with whom the child lives, or an individual who is legally responsible for the child's welfare; or
>
> (5) A surrogate parent who has been appointed in accordance with § 300.519 or section 639(a)(5) of the Act.
>
> (b)(1) Except as provided in paragraph (b)(2) of this section, the biological or adoptive parent, when attempting to act as the parent under this part and when more than one party is qualified under paragraph (a) of this section to act as a parent, must be presumed to be the parent for purposes of this section **unless the biological parent or adoptive parent does not have legal authority to make educational decisions for the child.**

(Emphasis added.)  A ward of the State is defined as, *inter alia*, "a child who, as determined by the State where the child resides, is – (1) A foster child; (2) A ward of the State; or (3) In the custody of a public child welfare agency."  34 C.F.R. § 300.45 (block format omitted).

Title 8 of the Hawai`i Administrative Rules, Chapter 60, helps to ensure State compliance with the IDEA.  For all intents and purposes, Haw. Admin. R. § 8-60-2 defines "parent" the same as 34 C.F.R. § 300.30(a)-(b).  Haw. Admin. R. § 8-60-73 explains the process for appointing, and the duties of, a surrogate parent:

> <u>Surrogate parents.</u> (a) General.  The department shall ensure that the rights of a student are protected when:
>
> (1) No parent (as defined in section 8-60-2) can be identified;

21

(2) The department, after reasonable efforts, cannot locate a parent;

(3) **The student is a ward of the State under the laws of that State**; or

(4) The student is an unaccompanied homeless youth as defined in section 725(6) of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11434a(6)).

. . . .

(g) Surrogate parent responsibilities. The surrogate parent may represent the student in all matters relating to:

(1) The identification, evaluation, and educational placement of the student; and

(2) The provision of a FAPE to the student.

(Emphasis added.)

As soon as Student was placed in temporary foster custody, the Hawai`i Child Protective Act governed Father's parental rights. The Hawai`i Child Protective Act defines temporary foster custody as "a legal status created under this chapter with or without a court order, whereby the department temporarily assumes the duties and rights of a foster custodian of a child." Haw. Rev. Stat. § 587A-4. The same statute defines foster custodian as "the authorized agency that has foster custody of the child." Id. Student, who was in foster custody pursuant to Hawai`i law, was therefore a ward of the State. See 34 C.F.R. § 300.45(1)-(3). Under the Hawai`i Child Protective Act:

Unless otherwise provided in this section or as otherwise ordered by the court, a child's family shall retain the following rights and responsibilities after a transfer of temporary foster custody or foster custody, to the extent that the family possessed the rights and responsibilities prior to the transfer of temporary foster custody or foster custody:

(1) The right of reasonable supervised or unsupervised visitation at the discretion of the authorized agency or the court;

(2) The right to consent to adoption, to marriage, or to major medical or psychological care or treatment; and

(3) The continuing responsibility to support the child, including repayment for the cost of any care, treatment, or other service provided by the authorized agency or the court for the child's benefit.

Haw. Rev. Stat. § 587A-15(c). Notably absent from this list is the right to remain involved in educational matters involving the child. Thus, pursuant to Hawai`i law, Father "[did] not have legal authority to make educational decisions for the child" at the time the 3/20/14 IEP was developed, and the DOE properly appointed a surrogate parent who was responsible for ensuring that the State attended to Student's educational needs. See 34 C.F.R. § 300.30(b)(1).

Plaintiffs submit that "nothing in [Haw. Rev. Stat. § 587A-15(c)] expressly states that the biological parent loses the legal authority to make education decisions when a child is in temporary foster custody and the Court should not assume that is the intent of the law." [Pltf.'s Suppl. Br. at 3.] "It is a

23

cardinal rule of statutory interpretation that, where the terms of a statute are plain, unambiguous and explicit, we are not at liberty to look beyond that language for a different meaning. Instead, our sole duty is to give effect to the statute's plain and obvious meaning." T-Mobile USA v. Cty. of Haw. Planning Comm'n, 106 Hawai`i 343, 352-53, 104 P.3d 930, 939-40 (2005) (citation and block quotation format omitted).  Haw. Rev. Stat. § 587A-15(c) enumerates the rights that Father retained when Student was placed in temporary foster custody.  The terms of the statute are "plain, unambiguous and explicit," and Plaintiffs do not cite any other section of the statute, nor any separate agreement, that shows that Father retained any additional rights over Student.  See id.  Having considered the record as a whole, the Court CONCLUDES that Plaintiffs have not carried their burden of proving that the DOE denied Father parental participation in the 3/20/14 IEP.  The Court HEREBY AFFIRMS the Decision with respect to its conclusion that the DOE's failure to include Father in the 3/20/14 IEP was not a denial of FAPE.

## II.  Parental Participation in the Development of the 1/20/15 IEP

Plaintiffs argue that the Hearings Officer erred when she found that the 1/20/15 IEP did not deny Father parental participation.  Specifically, Plaintiffs state that the Home School's refusal to accommodate Father by rescheduling the IEP meeting to February 2015 shows that the Home School "places the

24

priority on strict deadlines over parental participation."

[Opening Br. at 28.]   In addition, Plaintiffs argue that

"Father's actions were similar to the father's actions in the

Doug C. case."   [Id. at 32.]

In Doug C., the initial discussion about the student's

IEP began in September 2010, and an IEP meeting was eventually

scheduled for November 9, 2010.   720 F.3d at 1041.   However,

student's father was sick on the day of the IEP meeting, informed

the school that he could not attend, and asked that the meeting

be rescheduled for the following week.   The student's school

offered to reschedule the IEP meeting on either of the next two

days, and also told the student's father that he could

participate by telephone.   When the student's father could not

commit to those days and informed the school that he wanted to be

physically present at the IEP meeting, the school went forward

with the November 9 IEP meeting without him.   Id.   The Ninth

Circuit held that the student's father

> vigorously objected to the Department holding an
> IEP meeting without him and asked the Department
> to reschedule the meeting for the following week.
> In response to the Department's offer to
> reschedule for either of the following two days,
> he agreed to try to attend but, understandably,
> could not firmly commit to a meeting date only one
> or two days later while he was sick.   Despite the
> foregoing, the Department went forward with the
> IEP meeting without him, over his repeated
> objections, and, at that meeting, decided to
> change [the student's] educational placement for
> the first time in six years.

Id. at 1044.  The DOE's primary defense was that they needed to have the IEP meeting before the student's existing IEP expired. The Ninth Circuit explained that, in considering "what a public agency must do when confronted with the difficult situation of being unable to meet the two distinct procedural requirements of the IDEA, in this case parental participation and timely annual review of the IEP," courts had to consider "the purposes of the IDEA:  to provide disabled students a free appropriate public education and to protect the educational rights of those students."  Id. at 1046 (citing 20 U.S.C. § 1400(d)).  The Ninth Circuit held that, "[i]n reviewing an agency's action in such a scenario, we will allow the agency reasonable latitude in making that determination."  Id.

        This case is easily distinguishable from Doug C.  It is clear that the Home School made every effort to include Father in the development of the 1/20/15 IEP.  As explained supra, the Home School could only conduct the IEP meeting without Father present if they were "unable to convince [him] that [he] should attend." 34 C.F.R. 300.322(d).  While the initial date for the IEP meeting was scheduled for June 2014, Father requested that the meeting be postponed until August.  The relevant parties met on August 21, 2014, but were unable to finish the IEP.  Thereafter, Father: requested that the September 2014 IEP be rescheduled for November; ignored two letters from Principal about scheduling an

IEP meeting in November; canceled the IEP meeting scheduled for

December 16, 2014 on December 15, 2014;[11] went on vacation with

Student from January 9, 2014 to February 15, 2015 without telling

Principal or anyone at the Home School; and failed to respond to

three letters from the Home School in January 2015.[12]  See supra

at Background, § B.  The 1/7/15 Letter, 1/12/15 Letter, and

1/14/15 Letter all stated that the CARD Clinical Director could

appear via telephone or Skype, and that the Home School could

_____

[11] Plaintiffs argue that the Hearings Officer erred when she
did not consider their argument that the December 16, 2015
meeting should not have taken place without Father present.
[Opening Br. at 22-24.]  This Court agrees that this was not
properly before the Hearings Officer, and it is therefore not
properly before this Court.  See, e.g., J.L. v. Mercer Island
Sch. Dist., 592 F.3d 938, 952 (9th Cir. 2009) ("[W]hen a
plaintiff has alleged injuries that could be redressed to any
degree by the IDEA's administrative procedures and remedies,
exhaustion of those remedies is required." (alteration in J.L.)
(citations and internal quotations marks omitted)).  Were the
Court to address this issue, Plaintiffs' argument would be
unavailing.  Plaintiffs do not allege that this was, in fact, an
IEP meeting, and they provide no authority to support their
position that Father had a right to participate.

[12] Plaintiffs argue that, while the Hearings Officer "cites
to letters written by the DOE on January 7, 12, and 14, 2015"
that Father did not respond to, "Father had already informed the
DOE on two separate occasions that he was requesting a meeting
date in February 2015 to accommodate participation by his autism
expert." [Opening Br. at 31.]  The 1/7/15 Letter, 1/12/15
Letter, and 1/14/15 Letter all offered specific alternatives and
accommodations that addressed Father's purported reasons for
postponing the IEP meeting until February 2015.  Moreover, while
the DOE must exert significant effort to ensure parent
participation in an IEP, this does not mean that the DOE must
hold an IEP meeting on a date and time dictated by a parent
without any consideration for DOE schedules or legal obligations.

provide an interpreter for Father, if he so desired.[13]   See id.

Plaintiffs admit that Father did not respond to any of these

letters.  [Opening Br. at 31.]

The Ninth Circuit has held that, where the DOE works

with a parent to schedule an IEP meeting, sends the parent

repeated notices of that meeting, and notes that, if the parent

fails to respond, the meeting will go forward without him or her,

the DOE satisfies the parental participation requirements of the

IDEA:

> Similarly, the record shows that the DOE also
> attempted to find a mutually acceptable time and
> place for the July 2008 IEP meeting.  The DOE
> began corresponding with [the parent] in
> preparation for the 2008 IEP meeting in May 2008,
> by requesting written consent to conduct
> observations of [the student], and requesting his
> performance reports.  The DOE repeated its
> requests on June 19 and July 10, 2008.  In a
> letter dated July 10, 2008, the DOE suggested
> three dates for the IEP meeting, and indicated
> that if no response was received before July 16,
> 2008, the meeting would be set for July 25, 2008.
> [The parent] failed to respond to any of the
> referenced correspondence, and did not attend the
> July 25, 2008 meeting.  Later, [the parent] cited
> a work conflict as her reason for missing the
> meeting.

K.D. v. Dep't of Educ., 665 F.3d 1110, 1124–25 (9th Cir. 2011).

Given the facts of this case, as well as the "reasonable

---

[13] See 34 C.F.R. §§ 300.322(c) (requiring the relevant
public agency to "use other methods to ensure parent
participation" if a parent cannot be there in person, including
an appearance via telephone) and (e) (requiring affirmative steps
by the DOE to ensure that a parent understands the IEP
proceedings, including use of an interpreter).

latitude" afforded to the DOE in matters such as this one, the Court CONCLUDES that Plaintiffs have not carried their burden of proving that the DOE denied Father parental participation in the 1/20/15 IEP.[14]  The Court HEREBY AFFIRMS the Decision with respect to its conclusions that the DOE properly conducted the 1/20/15 Meeting.

**CONCLUSION**

On the basis of the foregoing, the Court HEREBY AFFIRMS the Hearings Officer's Findings of Fact, Conclusions of Law and Decision of September 22, 2015.  There being no remaining claims, the Court DIRECTS the Clerk's Office to close this case on **November 21, 2016**, unless Plaintiffs file a motion for reconsideration of this Order by **November 17, 2016**.

IT IS SO ORDERED.

---

[14] Because the Court has concluded that Student was not denied FAPE in either the 3/20/14 IEP nor the 1/20/15 IEP, the Court does not need to address Plaintiffs' request for remand for further hearing on the issues of private placement and tuition reimbursement.  <u>See</u> Opening Br. at 34-35.

DATED AT HONOLULU, HAWAII, October 31, 2016.



_/s/ Leslie E. Kobayashi_____
Leslie E. Kobayashi
United States District Judge

P.M., ET AL. VS. DEPARTMENT OF EDUCATION, STATE OF HAWAII; CIVIL
15-00437 LEK-RLP; ORDER AFFIRMING THE HEARINGS OFFICER'S
SEPTEMBER 22, 2015 DECISION